UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JANE DOE (K.R.D.), AN INDIVIDUAL<br>Plaintiff<br><br>v.<br><br>INTERCONTINENTAL HOTELS GROUP<br>PLC, SIX CONTINENTS HOTELS, INC.,<br>HOLIDAY HOSPITALITY FRANCHISING,<br>LLC, IHG MANAGEMENT (MARYLAND)<br>LLC, AND NEW DTRS MIGHIGAN<br>AVENUE, LLC<br><br>Defendants | CIVIL ACTION NO: _____ |

**ORIGINAL COMPLAINT**

COMES NOW Plaintiff Jane Doe (K.R.D.), by and through the undersigned counsel, and respectfully submits her Original Complaint for damages.

**SUMMARY**

1.    Jane Doe (K.R.D.) is a survivor of sex trafficking. Jane Doe (K.R.D.)'s trafficker repeatedly and trafficked Jane Doe (K.R.D.) at the InterContinental located at 505 North Michigan Ave., Chicago, IL 60611 ("InterContinental Chicago").

2.    The InterContinental Chicago was jointly operated by InterContinental Hotels Group PLC, Six Continents Hotels, Inc., Holiday Hospitality Franchising, LLC and IHG Management (Maryland) LLC (collectively "the IHG Brand Defendants" or "IHG") and New DTRS Michigan Avenue, LLC, ("InterContinental Franchisee"). InterContinental Franchisee, directly and through its management agreement with IHG, provided "boots on the ground" at the InterContinental Chicago, while the IHG Brand Defendants directly participated in and controlled relevant hotel operations, including by playing a central role in the rental of rooms and through

1

intimate involvement in aspects of operations related to the detection of and response to sex trafficking. InterContinental Franchisee also acted as the agent of the IHG Brand Defendants when operating the InterContinental Chicago.

3. As discussed herein, the IHG Brand Defendants and InterContinental Franchisee each derived a financial benefit from widespread use of the InterContinental Chicago for sex trafficking, including the trafficking of Jane Doe (K.R.D.). Despite obvious and apparent signs of sex trafficking at the InterContinental Chicago, the IHG Brand Defendants and InterContinental Franchisee continued renting hotel rooms to these traffickers and operated the InterContinental Chicago in a way that enabled sex trafficking, including by creating a haven where traffickers could operate without disruption from hotel staff and with minimal risk of detection and traceability.

4. Jane Doe (K.R.D.) files this civil lawsuit under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, *et seq*, for the harms and losses she suffered because of the sex trafficking she endured at the InterContinental Chicago, which the IHG Brand Defendants and InterContinental Franchisee each benefited from and facilitated.

## PARTIES

5. Jane Doe (K.R.D.) is a natural person who is currently a resident and citizen of California. She will be filing a motion to proceed pseudonym shortly after filing this lawsuit. Given the nature of the allegations in this lawsuit, there is a collective, recognized, and compelling interest in not publicly revealing the identity of Jane Doe (K.R.D.).

6. InterContinental Hotels Group PLC is a public limited company with its principal place of business in the United Kingdom at Broadwater Park, Denham, Buckinghamshire, UB9 5 HR. It can be served by its director Graham Denis Allan at 1 Windsor Dials, Arthur Road, Windsor,

Berkshire, England, SL4 1RS. InterContinental Hotels Group PLC HHF is one of the "IHG Brand Defendants."

7. Six Continents Hotels, Inc. ("SCH") is a Delaware corporation with its principal place of business in Atlanta, Georgia. SCH is a direct corporate parent to Holiday Hospitality Franchising, LLC. It can be served by its registered agent, United Agent Group Inc. at 2985 Gordy Parkway, 1st Floor, Marietta, GA, 30066. SCH is one of the "IHG Brand Defendants."

8. Holiday Hospitality Franchising, LLC ("HHF") is a Delaware company with its principal place of business in Atlanta, Georgia and members in Atlanta, Georgia. It can be served by its registered agent, United Agent Group Inc. at 1320 Tower Road, Schaumburg, IL 60173. HHF is one of the "IHG Brand Defendants."

9. IHG Management (Maryland) LLC ("IHG") is a for-profit Maryland company with its principal place of business in Maryland and members in both Massachusetts and Maryland. It can be served by its registered agent United Agent Group Inc. at 1320 Tower Road, Schaumburg, IL 60173. Upon information and belief, IHG is a wholly owned subsidiary of Holiday Hospitality Franchising, LLC. IHG is one of the "IHG Brand Defendants."

10. New DTRS Michigan Avenue, LLC ("New DTRS") is a for-profit Delaware company with its principal place of business in Chicago, Illinois and members in Chicago, Illinois. It can be served by its registered agent Illinois Corporation Service Company at 801 Adlai Stevenson Drive, Springfield, IL 62703. Upon information and belief, New DTRS contracted with IHG to operate the InterContinental Chicago on its behalf. It is referred to as "InterContinental Franchisee."

3

**JURISDICTION AND VENUE**

11.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

12.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this claim occurred in this judicial district.

13.     Jane Doe (K.R.D.) was trafficked in this District and Division.

**SEX TRAFFICKING AND THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT**

14.     Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

15.     In 2008, Congress, through the TVPRA, expanded the remedies available to survivors of sex trafficking. In so doing, it recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—benefit from participation in ventures that facilitate sex trafficking.

16.     In the TVPRA, Congress adopted a broad definition of sex trafficking to "address the increasingly subtle methods of traffickers who place their victims in modern-day slavery."[1]

17.     The TVPRA defines sex trafficking as the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of causing the person to

---

[1] H.R. REP. NO. 106-939, at 101; 18 U.S.C. § 1591(e)(5).

engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[2]

18.     Fraud includes any "deliberate act of deception, trickery or misrepresentation."[3]

19.     Coercion includes "threats of serious harm to or physical restraint against any person; any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or the abuse or threatened abuse of law or the legal process."[4]

20.     Serious harm refers to "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm."[5]

21.     Some victims are brought into trafficking through abduction or use of physical violence, while many other trafficking relationships begin with a false promise of a romantic relationship or financial security.[6] Traffickers often prey on individuals with vulnerabilities that make them more susceptible to coercion and control.[7]

22.     Traffickers then use a variety of techniques to maintain control over their victims. Some traffickers use physical violence and overt threats to control their victims, while others use more subtle forms of fraud and coercion.[8] Many traffickers use techniques to undermine victims' ability to think and act independently through repetitive infliction of psychological trauma. These

---

[2] 18 U.S.C. §1591; 22 U.S.C. § 7102.
[3] *United States v. Bell*, 761 F.3d 900, 909 (8th Cir. 2014)
[4] 18 U.S.C. §1591(e)(2).
[5] 18 USC § 1591(e)(5).
[6] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking
[7] Polaris Project, Sex Trafficking: The Basics, https://polarisproject.org/understanding-human-trafficking/
[8] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking

techniques can include high levels of control, exposure to chronic stress and threat, isolation, provocation of fear, and the creation of a sense of helplessness in victims.[9]

## **FACTS**

**I.    Jane Doe (K.R.D.) was a Victim of Unlawful Sex Trafficking at a Hotel Owned, Operated, Managed, and Controlled by Defendants.**

23.    Jane Doe (K.R.D.) is a victim of sex trafficking under 18 U.S.C. §1591(a) and §1595(a). Her trafficker used physical violence, psychological abuse and manipulation, overt threats of violence to Jane Doe (K.R.D.) and her family, a pattern of threatening and intimidating conduct, fraudulent promises of a romantic relationship/financial stability, exploitation of financial dependence, exploitation of dependence on illegal drugs, extreme restrictions on Jane Doe (K.R.D.)'s freedom, extreme isolation, and coercive control to require her to engage in commercial sex for his financial benefit, including at the InterContinental Chicago.

24.    Jane Doe (K.R.D.) first came under the control of her trafficker in April 2014. She remained under the continuous control her trafficker until May 2016. Between March 1, 2016 and the end of April 2016, her trafficker regularly and repeatedly trafficked Jane Doe (K.R.D.) at the InterContinental Chicago.

25.    In April 2014, while navigating the emotional turmoil of a divorce, Jane Doe (K.R.D.) met her trafficker on an online dating site. He preyed on her vulnerability and used false promises of a romantic relationship and financial security to gain her trust and make her dependent on him. This trafficker then used that dependence along with violence and physical abuse to require Jane Doe (K.R.D.) to engage in commercial sex for his financial benefit.

---

[9] Elizabeth Hopper, Ph.D. & José Hidalgo, M.D., *Invisible Chains: Psychological Coercion of Human Trafficking Victims*, 1 Intercultural Hum. Rts. L. Rev. 185, 191 (2006).

26.     Throughout her trafficking period, Jane Doe (K.R.D.)'s trafficker used various techniques to maintain control over her and to cause her to engage in commercial sex for his financial benefit.

- He often beat Jane Doe (K.R.D.), leaving bruising and other visible injuries on her face and body.

- He sexually assaulted Jane Doe (K.R.D.) getting her pregnant in August 2014. He later used their child as leverage to promote the trafficking venture.

- He withheld food from Jane Doe (K.R.D.).

- He made it known that he carried weapons and would kill her if she left.

- He expressly threated violence against Jane Doe (K.R.D.).

- He expressly threatened violence against Jane Doe (K.R.D.)'s family.

- He denied Jane Doe (K.R.D.) any financial means to care for herself or their child by requiring that she give him all of the money.

- He required Jane Doe (K.R.D.) to take drugs and used Jane Doe (K.R.D.)'s dependence on drugs to control her.

- The trafficker psychologically abused Jane Doe (K.R.D.), including by shaming her, insulting her, and convincing her that she was worthless.

- He made Jane Doe (K.R.D.) financially dependent on them to gain control of her, and then threatened to cut off her support if she did not comply with his demands.

- The trafficker took all of Jane Doe (K.R.D.)'s cash, her child, and most of her possessions, allowing her access to things and her son only when she met her "quota."

- The trafficker engaged in a pattern of control and intimidating and threatening behavior that caused Jane Doe (K.R.D.) to believe she would face serious harm, death, or physical restraint if she did not comply with his ongoing demand that she engage in commercial sex for his financial benefit.

- The trafficker imposed strict rules on Jane Doe (K.R.D.)'s behavior and restrictions on her movements.

- He forced Jane Doe (K.R.D.) to engage in criminal behavior and then threatened her with punishment if she did not comply with his demands.

7

27. Jane Doe (K.R.D.)'s trafficker required her to "earn" a certain amount of money each day, but the trafficker collected the proceeds and limited Jane Doe (K.R.D.)'s access to cash.

28. Jane Doe (K.R.D.)'s trafficker used the control he maintained through the above-described methods to require Jane Doe (K.R.D.) to engage in commercial sex at the InterContinental Chicago. Jane Doe (K.R.D.) was repeatedly harbored, maintained, provided, solicited, and forced to engage in commercial sex at the InterContinental Chicago.

29. During the period that she was trafficked at the InterContinental Chicago, Jane Doe (K.R.D.)'s trafficking had profound effects on her, including effects on her appearance, demeanor, movements throughout the hotel, and her interactions with others. This manifested in signs of Jane Doe (K.R.D.)'s trafficking that were obvious and apparent to the staff at the InterContinental Chicago. These signs included visible injuries on her face and body, nervous and fearful demeanor, signs of paranoia, disorientation, limited access to appropriate clothing, provocative clothing, signs of malnourishment, appearing under the influence of illegal drugs, inability to provide logical responses to basic questions, providing obviously scripted responses when questioned, lack of personal possessions, signs of sleep deprivation and poor hygiene, requesting excessive amounts of towels and linens from hotel staff, excessive use of the do not disturb sign, remnants and odors of illegal drugs used in the room, excessive evidence of sex paraphernalia found in the room. These signs matched "red flags" of trafficking that the hotel industry and each Defendant recognized to be indicators of sex trafficking in a hotel environment.

## II. The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

30. The widely known and pervasive relationship between sex trafficking and the hotel industry cannot be disregarded and necessarily shapes what each Defendant knew or should have

known regarding the trafficking at the InterContinental Chicago, including the trafficking of Jane Doe (K.R.D.).

31. Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[10] For years, sex traffickers have been able to reap their profits with little risk when attempting to operate within hotels.[11] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[12] Hotels have been found to account for over 90% of the commercial exploitation of children.[13]

32. Because of this link between hotels and sex trafficking, government bodies, law enforcement agencies, non-profits, and hotel trade associations—including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, EPCAT, and others—have devoted significant efforts to intervening and educating the hotel industry, including each of the Defendants, on best practices for identifying and responding to sex trafficking.[14]

---

[10] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019),https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[11] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57774091e4b0f168323a1ed7.

[12] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[13] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

[14] *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

33.     This resulted in the development of "red flags" of sex trafficking. Law enforcement agencies and other organizations with subject-matter expertise identified specific indicators of the presence of sex trafficking at a hotel. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel. These recurring indicators are known as "red flags" of sex trafficking.

34.     Recognized "red flags" of sex trafficking that are considered general indicators of trafficking that can be observed by staff throughout a hotel[15] include:

- individuals who appear to be with a significantly older "boyfriend" or in the company of much older males;
- a group of girls who appears to be traveling with an older female or male;
- a group with similar tattoos, which can indicate "branding" by a trafficker;
- individuals showing fear, anxiety, tension, submissiveness and/or nervousness;
- individuals who seem disoriented;
- individuals showing signs of physical abuse;
- individuals showing signs of restrain or confinement;
- individuals showing signs of malnourishment, poor hygiene, fatigue, or sleep deprivation;
- individuals with signs of untreated illness or injuries;
- individuals who appear to lack freedom of movement;
- individuals who are being constantly monitored and/or escorted around the hotel;
- individuals who avoid eye contact;
- individuals who avoid interactions with others;
- individuals who are not in possessions of their own identification;
- individuals who have few or no personal possessions;
- individuals who dress provocatively;

---

[15] *See id.*

10

- a high volume of men who are not registered guests entering and exiting a room; and

- individuals who wait in common areas while other men frequent the room.

35.     Recognized "red flags" of sex trafficking that can be detected by front-desk staff and hotel security[16] include:

- patrons appeared distressed at check-in;

- the same person reserving multiple rooms;

- rooms paid for with cash or prepaid cards;

- rooms are paid for one day at a time;

- requests for isolated rooms or rooms close to an exit;

- use of hotel computers for adult oriented or sexually explicit websites;

- patrons not forthcoming about identifying information when registering;

- individuals checking in but then leaving a room only infrequently, not at all, or at odd hours;

- individuals lack identification;

- car in the parking lot is parked so license plate is not visible;

- individual present who avoids eye contact, does not communicate, and is accompanied by someone else who appears to speak for them; and

- individual appears to be giving scripted responses.

36.     Recognized "red flags" of sex trafficking that can be detected by housekeeping, maintenance, and room service staff[17] include:

- constant use of the "Do Not Disturb" sign;

- requests for housekeeping services (towels, linens, etc.) but denying staff entry into the room;

- refusal of cleaning services for multiple days;

- excessive amounts of cash in a room;

- presence of multiple computers, cell phones, pagers, or other technology;

---

[16] *See id.*
[17] *See id.*

11

- the same person reserving multiple rooms;
- individuals leaving the room infrequently, not at all, or at unusual hours;
- individuals loitering in hallways or appearing to monitor a room;
- excessive alcohol in a room;
- illegal drugs in a room;
- evidence of pornography;
- excessive number of people staying in a room;
- guests with few or no personal possessions in room;
- provocative clothing and shoes;
- constant flow of men into a room at all hours; and
- excessive amounts of sex paraphernalia in rooms.

37.    The organizations who developed these "red flags," then educated and trained the hotel industry about them. For example, the United States Department of Homeland Security's Blue Campaign initiative issued specific guidance to the United States hotel industry through a "Hospitality Toolkit" describing human trafficking warning signs that could be detected by various categories of hotel staff. [18]

38.    Before Jane Doe (K.R.D.)'s trafficking at the InterContinental Chicago, each Defendant was educated and trained on these "red flags" of sex trafficking. The organizations that developed these "red flags" identified them as indicators specific to sex trafficking in a hotel environment. At all relevant times, each Defendant acknowledged and recognized these "red flags" specifically as signs of sex trafficking and instructed and trained their staff to treat them as signs of sex trafficking when observed in the hotel.

---

[18] / Department of Homeland Security, Blue Campaign Toolkit,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.;
www.doj.state.wi.us/sites/default/files/ocvs/human%20trafficking/Hospitality%20Toolkit%20-%20English%20-
%20Wisconsin%20AG%20Office%281%29.pdf

39.     It is, and has at all relevant times, been well established that signs of commercial sex in a hotel environment are "red flags" for the presence of sex trafficking.

40.     There is a well-known link between commercial sex in a hotel environment and sex trafficking. The United States Department of Justice and other agencies and organizations have recognized that most individuals involved in commercial sex are subject to force, fraud, or coercion.[19] As a result, these women are victims of sex trafficking. Most federal sex trafficking prosecutions involve individual traffickers acting as "pimps" who are operating without direction from or connection to a larger criminal network.[20] It is well known that the "traffickers in hotel/motel based commercial sex situations are often individual controllers, more commonly known as 'pimps.'"[21]

41.     State, local, federal, and international governments and law enforcement agencies have long recognized the link between commercial sex and sex trafficking. For example:

- "The U.S. Government adopted a strong position against legalized prostitution in a December 2002 National Security Presidential Directive based on evidence that prostitution . . . . fuels trafficking in persons, a form of modern-day slavery."[22]

- In 2006 the United Nations Commission on Human Rights, Special Rapporteur or Trafficking in Persons recognized that "[f]or the most part, prostitution, as actually practiced in the world, usually does satisfy the elements of trafficking."[23]

- By 2008, a report of the Illinois Criminal Justice Information Authority concluded "young women in the sex trade who are controlled by a pimp should not be regarded

---

[19] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

[20] Human Trafficking Institute, 2020 Federal Human Trafficking Report 28 (2021), https://traffickinginstitute.org/wp-content/uploads/2022/01/2020-Federal-Human-Trafficking-Report-Low-Res.pdf.

[21] National Human Trafficking Hotline, *Hotel-Motel Based*, https://humantraffickinghotline.org/en/sex-trafficking-venuesindustries/hotelmotel.

[22] United States Department of State, *The Link Between Prostitution and Sex Trafficking* https://2001-2009.state.gov/r/pa/ei/rls/38790

[23] U.N. Escor, Comm'n on Human Rights, *13 Integration of the Human Rights of Women and a Gender Perspective, Report of the Special Rapporteur on the Human Rights Aspects of the Victims of Trafficking in Persons, Especially Women and Children, ¶ 42 U.N. Doc. E/CN.4/2006/62 (Feb. 20, 2006) (Sigma Huda)

as girls in prostitution, but as victims of violence who need assistance in safely exiting prostitution."[24]

- In 2010, the Anaheim Police Department (APD) recognized that a significant portion of those involved in prostitution who it came into contact with were likely trafficking victims and adopted a new approach that focused on rescuing women from their pimps and redirecting their lives.[25]

- In 2013, the New York State Court System launched the Human Trafficking Intervention Initiative recognizing that many individuals who end up in criminal courts are on prostitution charges "are recruited into the commercial sex industry by force, fraud, and/or coercion."[26]

42. When governmental bodies, law enforcement agencies, non-profits, and hospitality-industry organizations developed the "red flags" of sex trafficking in a hotel, they recognized that signs of commercial sex are and should be treated as signs of sex trafficking. Based on the known link between commercial sex and trafficking and the patterns of sex trafficking in hotels, these entities recognized that certain signs associated with commercial sex are important indicators for the detection of sex trafficking in a hotel.

43. Defendants, as members of the hotel industry, were educated and trained on the link between commercial sex in a hotel and sex trafficking. Accordingly, as of the time of Jane Doe (K.R.D.)'s trafficking, each Defendant knew and recognized that signs of commercial sex in a hotel are and should be treated as signs of sex trafficking.

44. Each Defendant knew that the link between commercial sex in a hotel environment and sex trafficking was sufficiently strong that ordinary prudence required treating signs of commercial sex activity as signs of sex trafficking. Under the circumstances, ordinary prudence

---

[24] https://humantraffickinghotline.org/sites/default/files/Domstic%20Sex%20Trafficking%20Chicago%20-%20ICJIA.pdf

[25] Steve Marcin, *Prostitution and Human Trafficking: A Paradigm Shift*, Law Enforcement Bulletin, https://leb.fbi.gov/articles/featured-articles/prostitution-and-human-trafficking-a-paradigm-shift#:~:text=After%20close%20analysis%20of%20prostitutes,tactic%20in%20addressing%20the%20problem.

[26] Center for State Court Innovation, *State Court Snapshot: New York State's Human Trafficking Intervention* Courts, https://cjinvolvedwomen.org/wp-content/uploads/2016/12/HTIC-1pager.pdf

further required each Defendant to avoid benefiting from rental of its rooms for commercial sex because doing so was associated with a strong probability that Defendants were thereby benefiting from the harboring of sex trafficking victims.

45.     The most effective weapon against sexual exploitation and human trafficking is education and training.[27] As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[28]

46.     This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[29] In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

47.     Because of the prevalence of human trafficking in hotels and the established body of knowledge about how hotels can detect and respond to signs of sex trafficking, it has long been apparent that the decision of a hotel or hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and deter trafficking is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

---

[27] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).
[28] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[29] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

48.     The IHG Brand Defendants have made the choice to ignore their knowledge of sex trafficking in their hotels and instead to inadequately train, respond and enforce their own developed and adopted sex trafficking policies. Thus, they have chosen to continue to benefit from sex trafficking of victims like Jane Doe (K.R.D.).

**III.     Sex Trafficking at IHG Brand Hotels was well Known by IHG Brand Defendants.**

49.     The IHG Brand Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. They have known, since well before Jane Doe (K.R.D.)'s that sex trafficking was ongoing and widespread at IHG properties.

50.     In fact, IHG Brand Defendants are so intimately familiar with the problem of sex trafficking at IHG brand hotels and throughout the hotel industry that they now partner directly with Polaris to offer anti-human trafficking training within the hotel industry. IHG Brand Defendants acknowledge that "traffickers often exploit victims through misuse of their identity for various financial schemes" and the difference sufficient training within the hotel industry can make.[30]

51.     Each of the IHG Brand Defendants monitored criminal activity occurring at its branded hotels and were aware of activity indicating commercial sex trafficking or related crimes occurring at those branded hotels, including the InterContinental Chicago where Jane Doe (K.R.D.) was trafficked.

52.     Information that has become public through news stories establishes the entrenched and pervasive nature of the IHG Brand Defendants' role in providing a venue where sex trafficking has continued unabated for years. The IHG Brand Defendants monitored news stories and online reviews for indicia of criminal activity at their branded locations, including sex trafficking.

---

[30]https://www.ihgplc.com/en/news-and-media/news-releases/2023/polaris-and-ihg-hotels-and-resorts-hosts-anti-human-trafficking-forum

16

Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at IHG brand hotels, including InterContinental properties:

- Sean "Diddy" Combs faced federal sex trafficking charges wherein Combs was convicted of transporting people across state lines for prostitution. [31] In May 2025, a victim testified disclosing a ten million dollar settlement from the InterContinental Hotel in Century City, Los Angeles following an assault by Combs in March 2016. [32]

- In May 2010, former NFL player Lawrence Taylor was charged with rape and patronizing a prostitute after sexually assaulting a minor at a Holiday Inn in Montebello, New York.[33]

- In July 2013, three people were arrested at a North Carolina Candlewood Suites for possession and distribution of illegal drugs along with prostitution charges.[34]

- In July 2013, dozens were arrested in stings targeting underage prostitutes and human traffickers in Jackson, Mississippi including at a Holiday Inn Express.[35]

- In September 2016, a Syracuse University administrator among others were arrested in a prostitution sting in New York at hotels including a Candlewood Suites.[36]

- In December 2016, two women were arrested for trafficking a minor at a Holiday Inn in Elk Grove, California.[37]

- In July 2018, a Utah man was arrested for human trafficking following an undercover detective's arrangement to meet a victim at a Candlewood Suites in Chyenne, Wyoming in response to an online sexual solicitation ad.[38]

- In December 2018, a man was arrested at a Pennsylvania Holiday Inn and faced human trafficking charges after allegations of rape and abuse at the Holiday Inn.[39]

[31] https://6abc.com/live-updates/diddy-trial-verdict-live-updates-sean-combs-sex-trafficking-case-nyc-jury-get-monday/16863026/entry/16904927/

[32] https://www.hypefresh.com/cassies-10m-deal-with-intercontinental-hotel-shocks-fans-days-before-trial/

[33] https://www.nydailynews.com/2010/05/06/former-giants-star-lawrence-taylor-busted-in-rape-of-16-year-old-bronx-girl-as-lawyer-cries-setup/

[34] https://patch.com/north-carolina/fortbragg/3-arrested-for-narcotics-and-prostitution-at-fayetteville-hotel

[35] https://www.wlbt.com/story/22970673/dozens-arrested/

[36] https://www.syracuse.com/crime/2016/09/details_on_people_arrested_in_prostitution_sting.html

[37] https://6abc.com/post/uber-driver-discovers-child-sex-trafficking-ring/1677748/?userab=abcn_du_cat_topic_feature_holdout-474*variant_b_redesign-1939%2Cotv_web_content_rec-539*variant_a_control-2267%2Cotv_search_page_design_unification-546*variant_b_search_redesign-2300

[38] https://svinews.com/2018/regional-news/23906/wyoming-news-briefs-july-9-2018/

[39] https://www.mcall.com/2018/12/07/jury-convicts-seth-mull-of-numerous-rape-and-human-trafficking-charges/

- In May 2021, nine human trafficking victims and two children were rescued from a Holiday Inn in Missouri after law enforcement agencies detained two suspects.[40]

- In October 2025, a man was arrested for Aggravated Promotion of Prostitution and Trafficking of Persons related to a prostitution ring running out of a Holiday Inn in Beaumont, Texas.[41]

53.     These articles are only limited representative examples. There are many similar articles about sex trafficking and other associated criminal activity at IHG branded hotels. Moreover, on information and belief, the IHG Brand Defendants are aware of additional significant law enforcement activity related to trafficking at its hotels that was not reported in the media.

54.     Reviews of IHG branded properties, which upon information and belief, each of the IHG Brand Defendants, monitored regularly, also show both the pervasiveness of drugs and sex trafficking at IHG branded properties and the IHG Brand Defendants' knowledge of the same. For example:

- A 2014 review of a StayBridge Suites in San Diego, California stated: "My son was able to meet his first prostitute at the age of 10 at the Staybridge Suites. She was on the second floor soliciting business as my son saw her and said "Is that a prostitute Daddy?." She continued with her business and said 2"[42]

- A July 2016 review of a Crowne Plaza in Pensacola, Florida stated: "…Now this is how I know this hotel has seen better days, the clientele. The type of people here were not up to the type of standard a hotel like this could have. Forget the trashy looking people, the loud people cursing in the hallways, the baby's screaming in the halls and pressing all of the elevator buttons, but I am quite positive I saw two ladies

---

[40] https://ksisradio.com/authorities-rescue-nine-human-trafficking-victims-in-columbia/
[41] https://kfdm.com/news/local/man-charged-with-human-trafficking-accused-of-managing-prostitution-ring
[42]
https://www.google.com/travel/hotels/StayBridge%20Suites%206639%20Mira%20Mesa%20Blvd,%20San%20Diego,%20CA%2092121/entity/CgsI7LzUlOy7tsz6ARAB/reviews?g2lb=2502548,2503771,2503781,4258168,4270442,4284970,4291517,4306835,4308227,4429192,4515404,4597339,4718358,4723331,4731329,4757164,4778035,4814050,4821091,4861688,4864715,4874190,4879519,4886082,4886480,4893075,4902277,4905351,4906023,4906050,4920622,4920940,4926165,4926489,4928499,4930751,4930752,4931359,4936393,47061553&hl=en-IN&gl=in&ssta=1&q=StayBridge+Suites+6639+Mira+Mesa+Blvd,+San+Diego,+CA+92121&grf=EmQKLAgOEigSJnIkKiIKBwjnDxACGBoSBwjnDxACGBwgADAeQMoCSgcI5w8QARgZCjQIDBIwEi6yASsSKQonCiUweDgwZGMwNzYyMTRhNTU5Yjk6MHhhmYTk4ZDlkZWMyOTUxZTZj&rp=EOy81JTsu7bM-gEQ7LzUlOy7tsz6ATgCQABIAcABAg&ictx=1&sa=X&ved=2ahUKEwicidzn--P8AhX_GzQIHT3fChcQ4gl6BAhsEAU

of the night making a living off of the world's oldest profession (aka prostitutes). This hotel could be great, however it is not there currently."[43]

- 2018 Tripadvisor review of the Crowne Plaza Chicago Hotel & Conference Center states "The bathroom and bedroom were very dirty, things weren't working correctly, the staff is very rude, they is no security. Crowne Plaza appear to serve prostitutes and drug dealers no problem. I am so happy my babies weren't with me on this short trip to IL, save your money and go to the double tree instead where it's much cleaner, safer, and quieter!"[44]

- A January 2018 review of a Holiday Inn Express in San Diego, California stated "…This hotel is more like a business brothel. A female was arrested on the site for prostitution. She returned the same night with another guest. Laundry machines barely worked. I brang my own blanket and sheets as a precaution. When you turned the shower on it would smell like old soup. There's been various times a random person came in and asked the front desk agents, guest, and myself if we had any weed. One male who seemed to be living on the street came in and made himself a cup of coffee while asking the few guest that were in the guest area for money. At this point I would much rather contact the property owner and go as far as corporate to investigate this location. The lack of respect by management would have anyone on their last nerve. Management didn't care. Only three employees did their job professionally…"[45]

- A July 2019 review of a Holiday Inn in Osage Beach, Missouri stated: "This is the worst hotel I've ever been in. There was mold all over the bathroom on the ceiling All over the shower curtain and in the corner. There was fleas in the carpet. alot roaming people a lot of drug activity. The room smelled so horrible I literally went and bought air fresheners and candles that didn't help a bit. I would NEVER recommend staying here for anybody"[46]

- A November 2019 review of a Holiday Inn in Charleston, South Carolina entitled "Horrible check in experience, sexual and racial harassment by front desk and cleaning member in the past" stated: "I revisited with a friend and walked the hotel in September. Nothing has changed...The hotel is located between two noisy highways, the lobby is old and outdated despite recent minor remodeling job, the rooms are dingy and small also old in design, the halls are narrow and old with old timey murals painted in them along side the elevator. Very unpleasant and no significant amenities. The restaurant is on the 3rd or 8th floor and the food is frozen microwaved repotted leftovers. Don't believe me, see for yourself...However, you will overpay!!!!!"[47]

[43] https://www.tripadvisor.com/Hotel_Review-g34550-d85576-Reviews-Pensacola_Grand_Hotel-Pensacola_Florida.html

[44] https://www.tripadvisor.com/Hotel_Review-g36630-d87683-Reviews-or1185-Crowne_Plaza_Chicago_O_Hare_Hotel_Conference_Center-Rosemont_Illinois.html

[45] https://www.yelp.com/biz/holiday-inn-express-mira-mesa-san-diego-san-diego

[46] https://www.expedia.co.in/Osage-Beach-Hotels-Ozark-Inn-Suites.h33138082.Hotel-Reviews

[47] https://www.tripadvisor.com/Hotel_Review-g54171-d97059-Reviews-or40-Holiday_Inn_Charleston_Riverview_an_IHG_hotel-Charleston_South_Carolina.html

- 2021 Tripadvisor review and 2022 Tripadvisor review of the Crowne Plaza Hotel Chicago O'Hare note the recurring presence of condom wrappers at this IHG brand hotel stating "found condom wrapper"[48] and "[a]s we went to pull out our sofa bed we found multiple open condom wrappers under the couch which shows you how thoroughly they do "clean" each room."[49]

- A March 2022 review of a Holiday Inn in Charleston, South Carolina stated: "Negative: There was a very large group of unruly nasty, extremely loud, drunk or drugged people in the room abutting our room. Screaming and banging on the doors, cursing and swearing. This occurred at 4 Am. They had to have been seen entering the hotel bybthe staff, but nothing was done to quell their unruly behavior before they reached their room which was connected to ours. They were banging and screaming like they wanted to kill someone. We were petrified with terror that they were going to kick down the door to our room. We were too afraid to call the desk or police because we were afraid that they may retaliate and wait for us in the morning. We didn't sleep a second. The staff made no attempt to even see what was going on. We're were so afraid that they would kill someone with all the loudest screaming I have ever heard. We were very unhappy with our stay there and couldn't wait to leave. I would hope that your company doesn't recommend this hotel anymore."[50]

- 2022 Tripadvisor review of the Crowne Plaza Lombard Downers Grove states "This place should be condemned. Not only is everything about the property outdated and lacking upkeep, but also there is a lack of integrity amongst the staff. There are clear indications of prostitution being run out of this hotel, including used condoms in the parking lot, and yet the staff and "security guards" do nothing. Perhaps they're getting a cut of the action to look the other way? Drug addicts with bandaids all over their arms to cover open sores are allowed to hang out in the lobby because they're "a regular" and are "harmless". This was like I was on some sort of hidden camera show to see how much I could tolerate. Anyone who stays here is putting their safety at risk and asking for a potential robbery."[51]

- A July 2022 review of a Crowne Plaza in Orlando, Florida stated: "…Overt and heavy drug (marijuana) use in the parking lot and smell in lobby upon arrival."[52]

- A January 2023 review of a Crowne Plaza in Orlando, Florida stated: "Hotel lobby had a recent refresh, but still worn in spots. However, the rooms are very old. It was clean. No bugs. Beds were good. Floors were worn and not clean. Walls need a repaint. There was an odor of mold in my hallway. And there was a hooker checking

---

[48] https://www.expedia.com/Chicago-Hotels-Crowne-Plaza-Hotel-Chicago-OHare.h20348.Hotel-Reviews

[49] https://www.booking.com/hotel/us/crowne-plaza-chicago-o-hare-conference-center.html

[50] https://www.booking.com/hotel/us/holiday-inn-charleston-riverview.html

[51] https://www.tripadvisor.com/Hotel_Review-g36048-d1165186-Reviews-or10-Crowne_Plaza_Lombard_Downers_Grove_an_IHG_hotel-Glen_Ellyn_DuPage_County_Illinois.html

[52] https://www.booking.com/hotel/us/crowne-plaza-orlando-universal.html

in one morning. With all the new hotels out there in Orlando, I would pass on this place. Needs some big changes to be considered Marriott caliber."[53]

55.     These reviews are limited representative examples. There are many similar online reviews for IHG branded hotels, and, on information and belief, there are additional similar reviews and other customer complaints from before 2014 through present that are not currently available on the internet but which the IHG Brand Defendants know about.

56.     Public statements confirm that the IHG Brand Defendants knew sex trafficking was a problem at IHG branded hotels and that they retained control over the response of IHG branded hotels to sex trafficking. The IHG brand has publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels, stating that the brand "condemn[s] human trafficking" and launching online anti-human trafficking training in summer 2019.[54]

57.     Unfortunately, while these statements reflect actual knowledge of the problem of sex trafficking at their branded hotels, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking and to stop receiving benefits from that trafficking.

58.     News stories, online reviews, guest complaints, public statements, and law enforcement efforts establish that, at the time Jane Doe (K.R.D.) was trafficked at the InterContinental Chicago, the IHG Brand Defendants knew or should have known:

  a. The use of IHG branded properties for sex trafficking was not limited to one location or geographic region but was a widespread problem;

  b. Commercial sex work occurring at IHG branded properties involved trafficking and compelled prostitution;

---

[53] https://www.tripadvisor.ca/Hotel_Review-g34515-d252356-Reviews-or2090-Crowne_Plaza_Orlando_Universal_Blvd-Orlando_Florida.html
[54] IHGHumanTrafficking.pdf

c. IHG franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at IHG hotel properties;

d. Their efforts, if any, to stop facilitating sex trafficking in IHG branded properties were not effective; and

e. They were, by their acts and omissions, facilitating sex trafficking at IHG branded properties by providing venues where that trafficking was occurring widely and without sufficient detection or deterrence.

59. Despite the continually mounting evidence that sex trafficking at IHG branded properties was ongoing and growing, the IHG Brand Defendants did not change course. The IHG Brand Defendants chose to continue earning revenue and profits from renting out space in their hotels as a venue for trafficking.

**IV. The IHG Brand Defendants and InterContinental Franchisee had actual and constructive knowledge of widespread and ongoing sex trafficking at the InterContinental Chicago and surrounding area.**

60. At all relevant times, the IHG Brand Defendants and InterContinental Franchisee also knew or should have known that sex trafficking was prevalent at the InterContinental Chicago specifically because there was widespread sex trafficking on site that followed well-established patterns and presented with obvious signs that the IHG Brand Defendants and InterContinental Chicago Franchisee knew and acknowledged to be indicators of sex trafficking in a hotel environment.

61. The IHG Brand Defendants and InterContinental Franchisee knew that the InterContinental Chicago was in a high-crime area with a high incidence of sex trafficking and related criminal activity. Before, during, and after the time that Jane Doe (K.R.D.) was trafficked at this hotel, law enforcement records indicate obvious and apparent criminal activity on the property and in the immediate vicinity.

62. Online articles and reports confirm the presence of criminal activity associated with sex trafficking in the immediate vicinity of the InterContinental Chicago:

- The City of Chicago has reported at least 461 sex offenses and criminal sexual assaults on North Michigan Avenue alone between 2016 and 2020.[55]
- In October 2023 Cook County Sherriff arrested ten people in an undercover human trafficking sting stating "[t]here is literally no end to the victims we come across." The sheriff said "[w]e have an entire group that just works with the victims. We are just overwhelmed."[56]
- The Safe House Project reported spotting labor trafficking of three minors in broad daylight on Michigan Avenue in front of a Marriott hotel.[57]
- A January 2024 article reports on the arrest of a Venezuelan man running a sex trafficking ring in Chicago wherein they found a 16 year old victim living in a migrant shelter just 3 miles from the InterContinental Chicago.[58]

63. Jane Doe (K.R.D.)'s trafficker and other traffickers repeatedly chose to use the InterContinental Chicago for their sex trafficking activity because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. The traffickers operated with minimal expenditure of time and resources on concealment due to an implicit understanding with the InterContinental Chicago that they could operate without risk of disruption.

64. All knowledge from the staff at the InterContinental Chicago is imputed to InterContinental Franchisee who thus knew about or was willfully blind to the trafficking at the InterContinental Chicago based on the direct observation of hotel staff, including management-level staff. This knowledge is imputed to the IHG Brand Defendants based on the existence of an agency relationship as described below.

---

[55] https://data.cityofchicago.org/Public-Safety/Crimes-2016-2020/3cx5-bci2/data_preview
[56] https://www.nbcchicago.com/news/local/8-arrested-in-undercover-human-trafficking-sting-cook-county-sheriff/3258425/
[57] https://www.youtube.com/watch?v=gu63Ynoja4M
[58] https://cwbchicago.com/2024/01/sex-trafficking-ring-forced-migrant-women-chicago-suburbs.html

65.     InterContinental Franchisee also knew or should have known about the sex trafficking at the InterContinental Chicago based on:

   a.   surveillance of the property;

   b.   internal investigations;

   c.   customer complaints;

   d.   monitoring of customer feedback;

   e.   information received from law enforcement;

   f.   and other sources of non-public information available to Franchisee.

66.     The IHG Brand Defendants required InterContinental Franchisee and hotel staff to report suspected criminal activity at the InterContinental Chicago, including sex trafficking, to the IHG Brand Defendants.

67.     Based on the obvious signs of sex trafficking at the InterContinental Chicago, InterContinental Franchisee was required to, and upon information and belief did, report numerous instances of suspected sex trafficking to the IHG Brand Defendants.

68.     The IHG Brand Defendants also knew or should have known about the trafficking at the InterContinental Chicago based on:

   a.   The obligation of hotel staff and InterContinental Franchisee to report suspected criminal activity, including sex trafficking, to the IHG Brand Defendants;

   b.   The IHG Brand Defendants' regular monitoring of online reviews;

   c.   The IHG Brand Defendants' collection and monitoring of customer surveys and complaints;

   d.   The IHG Brand Defendants' requirement that InterContinental Franchisee submit regular and detailed reports to the IHG Brand Defendants about day-to-day hotel operations;

   e.   The IHG Brand Defendants' collection and monitoring of data about guests at the InterContinental Chicago, including but not limited to room reservations,

identification and payment information, data from websites visited on Wi-Fi, and other guest data;

f. The IHG Brand Defendants' supervision and control over day-to-day operations of the InterContinental Chicago through detailed information and extensive reports that it obtained through the property management system and other software systems it required franchisee to use and through which franchisee was obligated to allow the IHG Brand Defendants to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

g. The IHG Brand Defendants' regular inspections of the InterContinental Chicago;

h. The IHG Brand Defendants' employment of "field agents" to work with hotels on security issues, including trafficking issues;

i. The IHG Brand Defendants' access to surveillance and security systems;

j. Information provided to the IHG Brand Defendants by law enforcement; and

k. Other sources of information available to the IHG Brand Defendants.

69. The IHG Brand Defendants observed obvious "red flags" of numerous instances of sex trafficking occurring at the InterContinental Chicago based on their supervision and monitoring of the property. As a result, the IHG Brand Defendants knew or should have known that the InterContinental Chicago was facilitating widespread sex trafficking.

**V. Defendants knew Jane Doe (K.R.D.) was being trafficked at the InterContinental Chicago because of the apparent and obvious "red flags" of sex trafficking.**

70. From March through April of 2016, Jane Doe (K.R.D.) was trafficked at the InterContinental Chicago on repeated and regular occasions. She estimates she was trafficked at this hotel on at least 3 occasions. On her repeated visits to the hotel, Jane Doe (K.R.D.) frequently encountered the same hotel staff members.

71. Jane Doe (K.R.D.)'s trafficker was present with her at the InterContinental Chicago and went back and forth from the room multiple times a day while Jane Doe (K.R.D.) was seeing johns and this repetitive behavior would have been obvious to hotel staff.

72. During the period that Jane Doe (K.R.D.) was trafficked at the InterContinental Chicago, there were obvious signs that her trafficker was engaged in sex trafficking:

- Jane Doe (K.R.D.) was present with her trafficker during check-in.

- Hotel staff would observe that Jane Doe (K.R.D.) arrived with few or no personal possessions.

- Jane Doe (K.R.D.) and her trafficker used the hotel Wi-Fi, which was monitored by InterContinental Franchisee and the IHG Brand Defendants, to place advertisements for Jane Doe (K.R.D.) on adult websites.

- Jane Doe (K.R.D.)'s trafficker often yelled at her within earshot of hotel staff.

- Hotel staff observed Jane Doe (K.R.D.) dressed provocatively throughout the hotel at all hours of the day.

- Jane Doe (K.R.D.) was required to have only limited conversation with hotel staff.

- When the hotel, staff observed Jane Doe (K.R.D.), she appeared emotional, nervous, and scared.

- Hotel staff observed Jane Doe (K.R.D.) utilizing the hotel's restaurant and bar to solicit johns. Bartenders would have over heard Jane Doe (K.R.D.)'s conversations. Staff would have witnessed her bring two to three johns from the bar or restaurant to her room throughout a single day.

- When the hotel staff observed Jane Doe (K.R.D.) it was apparent she was under the influence of illegal drugs, which her trafficker used to control her.

- Further, hotel staff would have smelled the illegal drugs that Jane Doe (K.R.D.) consumed in the rooms of the InterContinental Chicago.

- Jane Doe (K.R.D.)'s trafficker forced her to solicit clients at the hotel, including in the lobby , bar, and restaurant, areas that were observed by hotel staff.

- Jane Doe (K.R.D.) was forced to see approximately four to five johns per day while at the InterContinental Chicago. These individuals, who were not registered hotel guests, entered and left at unusual hours and were present at the hotel for brief periods of time.

- When Jane Doe (K.R.D.) was in her room seeing johns, her trafficker would be lingering in common areas of the hotel where her was observed by hotel staff.

- After Jane Doe (K.R.D.) saw each john, her trafficker would come to collect the money. Thus, hotel staff observed Jane Doe (K.R.D.)'s trafficker walking back and forth to her room and leaving with money many times each day.

- The "Do Not Disturb" door hanger was used at all times.

- Housekeeping staff was usually prevented from entering the room for regular cleaning, towel exchange, and other standard room services.

- Jane Doe (K.R.D.) used an excessive number of linens and towels.

- Extra towels and linens were requested multiple times a day by calling down to the front desk and hotel staff bring them up.

- When hotel staff did enter Jane Doe (K.R.D.)'s room, they would observe excessive amounts of sex paraphernalia like condom wrappers and lubricant.

- When hotel staff did enter Jane Doe (K.R.D.)'s room, they would observe illegal drug paraphernalia.

- When Jane Doe (K.R.D.)'s trafficker moved on from the InterContinental Chicago, they made no effort to clean the room and would leave excessive amounts of sex and drug paraphernalia.

- Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

73. Multiple employees at the InterContinental Chicago, including management-level employees, observed or were made aware of these obvious signs of Jane Doe (K.R.D.)'s trafficking while acting within the scope and course of their employment.

74. As such, InterContinental Franchisee knew or was willfully blind to the fact that Jane Doe (K.R.D.) was being trafficked at the InterContinental Chicago.

75. Given these obvious signs, the IHG Brand Defendants knew or should have known about the trafficking activity that resulted in the trafficking of Jane Doe (K.R.D.) pursuant to their policy or protocol under which InterContinental Franchisee and hotel staff were required to, and upon information and belief did, report suspected sex trafficking to the IHG Brand Defendants.

76. The IHG Brand Defendants also knew or should have known about the trafficking of Jane Doe (K.R.D.) based on the numerous tools, described above, through which they monitored and supervised the InterContinental Chicago.

77. The IHG Brand Defendants also had constructive knowledge of the activity that resulted in the trafficking of Jane Doe (K.R.D.) at the InterContinental Chicago because that activity was accompanied by such recognized "red flags" of sex trafficking that it was readily

27

detectable through the exercise of ordinary diligence. If the IHG Brand Defendants had exercised ordinary prudence in areas of operations over which they retained control or in which they directly participated, they would have detected and stopped benefiting from the illegal activities of Jane Doe (K.R.D.)'s trafficker at the InterContinental Chicago:

a. The IHG Brand Defendants retained control over, assumed responsibility for, and were directly involved in training and education of hotel staff regarding the detection of sex trafficking. If they had exercised ordinary prudence in creating, providing, and enforcing this training, then the activities of Jane Doe (K.R.D.)'s trafficker would have been detected.

b. The IHG Brand Defendants retained control over, assumed responsibility for, and affirmatively participated in the development, implementation, and enforcement of policies, procedures, and practices regarding the detection of and response to suspected sex trafficking at the InterContinental Chicago. If they had exercised ordinary prudence in adopting, implementing, and enforcing policies and protocols, then the activities of Jane Doe (K.R.D.)'s trafficker would have been detected.

c. The IHG Brand Defendants played a primary role in the rental of rooms at the InterContinental Chicago. If they had exercised ordinary prudence as to the development, implementation, and enforcement of policies, procedures, and practices regarding standardized check-in protocol, payment methods, identification requirements, obtaining vehicle information, and monitoring visitors who are not registered hotel guests, then the activities of Jane Doe (K.R.D.)'s trafficker would have been detected.

d. The IHG Brand Defendants retained control over and directly participated in the collection, tracking and analysis of guest data, property data, Wi-Fi data, and security data and retained sole ownership of all guest data. This data revealed "red flags" of sex trafficking. If the IHG Brand Defendants had exercised ordinary prudence as to the monitoring and analysis of this data, the activities of Jane Doe (K.R.D.)'s trafficker would have been detected.

## VI. Defendants actively facilitated sex trafficking at the InterContinental Chicago, including the trafficking of Jane Doe (K.R.D.)

### A. InterContinental Franchisee facilitated the trafficking activity at the InterContinental Chicago, including the trafficking of Jane Doe (K.R.D.)

78. InterContinental Franchisee harbored and facilitated the providing, maintenance, and exploitation of Jane Doe (K.R.D.) and other victims of sex trafficking at the InterContinental Chicago when it continued to provide rooms where they were imprisoned and exploited despite

28

actual knowledge of or willful blindness to the fact that they were being trafficked at the InterContinental Chicago.

79. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the InterContinental Chicago, InterContinental Franchisee continued renting rooms to be used in sex trafficking, providing traffickers with a safe heaven, and operating the InterContinental Chicago in a way that enabled and facilitated sex trafficking activity.

80. Although InterContinental Franchisee knew or should have known about the activity that resulted in Jane Doe (K.R.D.) being trafficked, InterContinental Franchisee continued to rent hotel rooms for and to facilitate that trafficking activity.

81. InterContinental Franchisee also facilitated widespread trafficking at the InterContinental Chicago, including the trafficking of Jane Doe (K.R.D.), in ways including:

a. continuing to provide rooms, services, and assistance to trafficking victims in the face of obvious "red flags" of trafficking of Jane Doe (K.R.D.) and other victims;

b. accommodating specific requests made by traffickers and their victims;

c. observing Jane Doe (K.R.D.) in obvious distress but continuing to provide support to her trafficker;

d. allowing johns and traffickers who were not registered hotel guests themselves to freely access the hotel without requiring identification or any other method of tracking;

e. using inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

f. following a pattern or practice of failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring on site;

g. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff;

    h. providing these traffickers with the cover of a legitimate business where they could operate without having to divert significant time and resources to avoid detection or interference by hotel staff.

82. InterContinental Franchisee's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe (K.R.D.)

83. InterContinental Franchisee knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

**B. The IHG Brand Defendants facilitated the trafficking activity at the InterContinental Chicago, including the trafficking of Jane Doe (K.R.D.)**

84. The IHG Brand Defendants participated directly in aspects of the operation of the InterContinental Chicago that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of Jane Doe (K.R.D.), as follows:

    a. assuming joint responsibility with the franchisee for detecting and preventing sex trafficking at the hotel property;

    b. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity;

    c. assuming or retaining control over and responsibility for training hotel staff on detecting and responding to sex trafficking based upon the well understood "red flags" or signs of sex trafficking;

    d. assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to sex trafficking;

    e. employing field-based associates who work with hotels on trafficking issues;

    f. assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

g. establishing systems for hotel staff and guests to report security issues to franchisor;

h. requiring franchisees to provide Wi-Fi/internet access to guests;

i. mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests;

j. setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

k. requiring franchisees to use a system to monitor and track housekeeping requests;

l. setting policies for when and how housekeeping services are provided;

m. collecting and monitoring data that shows patterns of use or non-use of housekeeping services;

n. setting policies for when and how hotel staff can accept tips.

85. IHG Brand Defendants played a central role in renting rooms at the InterContinental Chicago by, among other things:

a. controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for guest reservation, check-in, and payment processes;

b. controlling, overseeing and enforcing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification.

c. requiring the franchisee to use the franchisor's centralized reservation system and preventing the franchisee from using any other system;

d. reserving rooms and accept payments without requiring franchisee approval or involvement;

e. controlling and restricting the ability of franchisee and staff to refuse or cancel a reservation.

f. requiring the franchisee to use a software system operated and controlled by the franchisor for booking rooms and checking guests into rooms;

31

g. requiring the franchisee to use a software system operated and controlled by the franchisor to process payments;

h. requiring the franchisee to use a property-management system operated and controlled by the franchisor;

i. requiring the franchisee to use a data-management system operated and controlled by the franchisor;

j. ensuring that data related to each room reservation passes through systems owned, maintained, and managed by the franchisor;

k. exercising control over the price of rooms;

l. controlling all details of the customer loyalty program that the franchisee was required to implement;

m. setting detailed policies for the check-in process, including requirements for identification and payment methods;

n. collecting guest data, requiring franchisees to report guest data, and reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay;

o. assuming sole ownership over all guest information;

p. overseeing do not rent (DNR) lists for its branded properties.

86. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the InterContinental Chicago, IHG Brand Defendants continued renting rooms to traffickers pursuant to their venture, including the rooms used to sexually exploit Jane Doe (K.R.D.).

87. Policies purportedly enacted and enforced by the IHG Brand Defendants to identify signs of sex trafficking and stop it from occurring were not properly implemented and/or enforced at the InterContinental Chicago.

88. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the InterContinental Chicago, including the activity that led to Jane

Doe (K.R.D.)'s trafficking, the IHG Brand Defendants used their retained control over and direct involvement in hotel operations to facilitate trafficking, including by:

a. adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to secure rooms without providing their own identifying information;

b. adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to pay for rooms using non-traceable methods;

c. adopting and enforcing inadequate training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

d. adopting and enforcing inadequate policies and protocols regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

e. providing traffickers continued access to Franchisor-maintained wi-fi and internet systems despite having active or constructive knowledge this access was being used to facilitate their trafficking activities;

f. adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at the InterContinental Chicago;

g. implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

89. The conduct of the IHG Brand Defendants in operating the InterContinental Chicago facilitated widespread sex trafficking at the hotel, including the trafficking activities of Jane Doe (K.R.D.)'s trafficker. The specific ways that the IHG Brand Defendants facilitated sex trafficking at the InterContinental Chicago—including but not limited to their policies and practices that allowed for non-traceable payment methods, their policies and practices that allowed traffickers to rent rooms with providing their true identities, and their inadequate and inappropriate

efforts at detection of and response to signs of sex trafficking—directly assisted and facilitated the activities of Jane Doe (K.R.D.)'s trafficker at this hotel and the trafficking of Jane Doe (K.R.D.).

90. Jane Doe (K.R.D.)'s trafficker were able to operate without interference and without making significant effort at a concealment during repeated visits to the InterContinental Chicago over an extended period because the IHG Brand Defendants adopted, implemented, enforced, and used policies and practices that facilitated sex trafficking and minimized the risk of detection and traceability.

91. Although the IHG Brand Defendants knew or should have known that the InterContinental Franchisee used its "boots on the ground" role at the InterContinental Chicago to facilitate sex trafficking, the IHG Brand Defendants facilitated, assisted, and supported InterContinental Franchisee in continuing to do so. The IHG Brand Defendants had numerous tools and options available to respond to the ongoing facilitation of sex trafficking at the InterContinental Chicago, both through options for disciplining and controlling InterContinental Franchisee and through their own ability to make relevant operational changes. Instead, the IHG Brand Defendants elected to continue lending the perceived legitimacy of its brand and its own direct operational involvement to a hotel that continued to operate in a way that facilitated widespread sex trafficking.

92. The IHG Brand Defendants' acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe (K.R.D.).

93. The IHG Brand Defendants knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking.

## VII.    Defendants' Ventures at the InterContinental Chicago

94.    InterContinental Franchisee and the IHG Brand Defendants each benefited from use of the InterContinental Chicago for sex trafficking. Jane Doe (K.R.D.)'s trafficker and other traffickers rented rooms at the InterContinental Chicago and used the hotel to harbor, maintain, and provide victims including Jane Doe (K.R.D.). When these traffickers rented rooms, both InterContinental Franchisee and the IHG Brand Defendants received a financial benefit.

95.    InterContinental Franchisee generated revenue every time a sex trafficker rented a room at the InterContinental Chicago, both from room rental fees and from fees for other hotel services

96.    Each of the IHG Brand Defendants generated substantial income from operations of hotels such as the InterContinental Chicago. In exchange for providing the services described above, each of the IHG Brand Defendants received a share of the revenue from room rentals collected at the InterContinental Chicago. The fees generated by the IHG Brand Defendants are primarily based on gross room rentals; therefore, the IHG Brand Defendants' revenue increase with each room rental at the InterContinental Chicago. Revenue generated from rooms rented at the InterContinental Chicago was distributed among the IHG Brand Defendants, with each benefiting from each rental of a hotel room.

97.    The IHG Brand Defendants also benefited from sex traffickers' frequent use of the InterContinental Chicago because this regular and routine use of the hotel increased the hotel occupancy rate, and an increase in the hotel occupancy rate resulted in several benefits for the IHG Brand Defendants, including that this assisted them in obtaining financing and helped them market franchising opportunities to potential franchisees.

98. As more fully described above, the IHG Brand Defendants and InterContinental Franchisee knowingly benefited from participating in a venture with sex traffickers who regularly operated at the InterContinental Chicago, including Jane Doe (K.R.D.)'s sex trafficker ("Venture 1").

99. Both the IHG Brand Defendants and InterContinental Franchisee participated in this venture through a continuous business relationship with these sex traffickers. The traffickers developed a continuous business relationship with the InterContinental Chicago, and both the IHG Brand Defendants and InterContinental Franchisee participated in this ongoing business relationship through their respective roles (as further described above) in hotel operations. This continuous business relationship involved mutual pursuit of benefit. These Defendants generated revenue from renting the rooms to traffickers who, in turn, used the rooms to generate revenue from the illegal sex trafficking operation. This continuous business relationship developed as:

   a. InterContinental Franchisee and the IHG Brand Defendants facilitated and enabled sex trafficking in the ways described above in Sections V-VI.

   b. These traffickers developed an understanding that hotel policies and practices would minimize their risk of detection and traceability.

   c. These traffickers developed an understanding that hotel staff would turn a blind eye and thus were able to operate without diverting time and resources to avoiding inference by hotel staff.

   d. These traffickers repeatedly returned to this same hotel because of an understanding that it was a venue that would enable and facilitate their sex trafficking operation.

100. InterContinental Franchisee participated in the continuous business relationship with these traffickers through their direct "boots on the ground" role at the InterContinental Chicago. As further described above in Section VI, the IHG Brand Defendants directly participated in this business relationship through their central role in room reservations and through their

36

intimate involvement in aspects of hotel operations related to the detection of and response to sex trafficking.

101. This continuous business relationship facilitated, assisted, and supported the traffickers' illegal sex trafficking activities, including their trafficking of Jane Doe (K.R.D.). The IHG Brand Defendants and InterContinental Franchisee did not only provide these traffickers with a physical space (harboring) but also with the cover of a legitimate business as a venue where they could profit from sexual exploitation without significant risk of disruption by hotel staff and with minimal risk of detection and traceability. The IHG Brand Defendants and InterContinental Franchisee also allowed johns who were not registered hotel guests to come and go freely without any need to identify themselves. This helped the traffickers to attract business from sex buyers and to minimize risks of detection and traceability. The conduct of both the InterContinental Franchisee and IHG Brand Defendants facilitated trafficking at the InterContinental Chicago.

102. The IHG Brand Defendants and InterContinental Franchisee knew or should have known that Venture 1 was engaged in violations of the TVPRA because victims were being harbored, maintained, provided, and exploited at the InterContinental Chicago by traffickers including Jane Doe (K.R.D.)'s trafficker.

103. In ways described more fully above, the IHG Brand Defendants and InterContinental Franchisee also knowingly benefited from participating together in a hotel-operating venture at the InterContinental Chicago that facilitated widespread sex trafficking, including the trafficking of Jane Doe (K.R.D.) (hereinafter "Venture 2").

104. Venture 2 is a commercial venture that resulted from a longstanding business relationship between InterContinental Franchisee and the IHG Brand Defendants that centered on

operation of the InterContinental Chicago. This undertaking involved shared goals of maximizing gross room revenue and increasing room occupancy rates.

105. InterContinental Franchisee Franchise and the IHG Brand Defendants each participated in Venture 2 through their respective roles in hotel operations as further described above in in Sections V-VI. Each of these Defendants was directly involved in aspects of operations that facilitated sex trafficking at the hotel and continued to operate the hotel in the same manner despite actual or constructive knowledge that this was facilitating sex trafficking.

106. There were TVPRA violations within the scope of Venture 2 because the hotel at the center of the venture, the InterContinental Chicago, was used to harbor, maintain, provide, and exploit many trafficking victims, including Jane Doe (K.R.D.) herself. There were also TVPRA violations with the scope of Venture 2 through InterContinental Franchisee's violations of 18 U.S.C. §1591(a) as a perpetrator.

107. Both InterContinental Franchisee and the IHG Brand Defendants knew or should have known that there were TVPRA violations within the scope of Venture 2 based on the obvious "red flags" associated with the trafficking activities of Jane Doe (K.R.D.)'s trafficker and other traffickers at the InterContinental Chicago.

108. The IHG Brand Defendants also knew or should have known that there were TVPRA violations within the scope of Venture 2 based on the role of InterContinental Franchisee in facilitating widespread sex trafficking, including by Jane Doe (K.R.D.)'s trafficker as further described in in Section V. Despite this, the IHG Brand Defendants continued to assist and facilitate these violations through their ongoing participation in this commercial venture with InterContinental Franchisee.

**VIII. InterContinental Franchisee and the Staff at the InterContinental Chicago Acted as Actual Agents of the IHG Brand Defendants.**

109. The IHG Brand Defendants are vicariously liable for the acts, omissions, and knowledge of InterContinental Franchisee and hotel staff, which acted as the IHG Brand Defendants' actual agents or subagents when operating the InterContinental Chicago.

110. The IHG Brand Defendants subjected and retained the right to subject the InterContinental Franchisee to detailed requirements regarding the operation of the InterContinental Chicago. These detailed requirements came from written agreements, manuals, policies, protocols, directives, and mandates that the IHG Brand Defendants imposed through its ongoing control of hotel operations.

111. The IHG Brand Defendants obscure the full extent of control it exercises over the InterContinental Franchisee by treating these manual, policies, and directives as confidential and proprietary and guarding against public disclosure. Upon information and belief, the requirements that that the IHG Brand Defendants imposed on the InterContinental Franchisee:

    a. Did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools InterContinental Franchisee used at the InterContinental Chicago, such as telling hotel staff step-by-step how to perform tasks at the hotel and mandating that InterContinental Franchisee Franchises use tools and products selected and controlled by the IHG Brand Defendants.

    b. Covered virtually all aspects of hotel operations, including internal operating functions, such as human-resources issues and accounting and finance practices.

    c. Dictated the specific ways that InterContinental Franchisee and hotel staff were required to carry out day-to-day functions.

    d. Required the use of IHG Brand Defendants' owned, operated and controlled reservation and operation systems software and hardware.

    e. Significantly exceeded what was necessary for the IHG Brand Defendants to protect their trademarks.

112. In addition to the ways described above, upon information and belief, IHG Brand Defendants exercised and reserved the right to exercise systemic and pervasive control over

39

InterContinental Franchisee's day-to-day operation of the InterContinental Chicago, including the following ways:

a. IHG Brand Defendants required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for IHG to protect its registered trademarks;

b. IHG Brand Defendants maintained a team of regionally based trainers to provide training at branded hotels. IHG provided training for hotel management and select hotel staff on-site and at locations selected by IHG;

c. IHG Brand Defendants provided hotels staff with training it created through an online learning platform it controlled and maintained, including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

d. IHG Brand Defendants controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e. IHG Brand Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f. IHG Brand Defendants participated in the hiring, disciplining, and terminating hotel management and employees;

g. IHG Brand Defendants required franchisees to participate in mandatory centralized services for day-to-day operation of the hotel;

h. For certain products and services that franchisee was required to purchase to operate the property, IHG Brand Defendants designated approved vendors and prohibited franchisee from purchasing goods and services from anyone other than an approved vendor;

i. IHG Brand Defendants required franchisees to use its revenue management system, through which it dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations of the hotel through direct access to the system;

j. The IHG Brand Defendants set and controlled room rates and discounts;

k. IHG Brand Defendants set required staffing levels for the InterContinental Chicago;

l.  IHG Brand Defendants established detailed job descriptions for all positions in its branded properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

m.  IHG Brand Defendants set requirements for and participated in the hiring process used by franchisees and oversaw and participated in employee discipline processes and termination decisions;

n.  The IHG Brand Defendants participated in setting employee wages and salaries for hotel staff;

o.  The IHG Brand Defendants exercised control over paid time off, flexible scheduling, employee discounts, and employee benefits for hotel staff;

p.  IHG Brand Defendants controlled channels for guests to report complaints or provide feedback regarding the InterContinental Chicago and directly participated in the response and/or supervised and the response to customer complaints or other feedback. IHG retained the right to provide refunds or other compensation to guests and to require InterContinental Franchisee to pay associated costs;

q.  IHG Brand Defendants generated reports and analysis of guest complaints and online reviews for the InterContinental Chicago;

r.  IHG Brand Defendants set detailed requirements for insurance that InterContinental Franchisee must purchase;

s.  IHG Brand Defendants exercised or retained control over the franchisee's day-to-day accounting and banking practices;

t.  IHG Brand Defendants regularly audited the books and records of InterContinental Franchisee;

u.  IHG Brand Defendants conducted frequent and unscheduled inspections of the InterContinental Chicago;

v.  IHG Brand Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if franchisee violated any of IHG's detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the InterContinental Chicago;

w.  IHG Brand Defendants controlled all marketing for the InterContinental Chicago, directly provided marketing services, and prohibited InterContinental Franchisee

41

from maintaining any online presence unless specifically reviewed and approved by IHG;

x. IHG Brand Defendants exercised or retained control over all aspects of building and facility design;

y. IHG Brand Defendants imposed detailed recordkeeping and reporting requirements on InterContinental Franchisee regarding virtually all aspects of hotel operations;

z. IHG Brand Defendants supervised and controlled day-to-day operations of the InterContinental Chicago through detailed information and extensive reports that it obtained through the property management system and other software systems it required InterContinental Franchisee to use;

aa. IHG Brand Defendants required the franchisee and hotel staff to implement a data system that gives Franchisor real-time information that it can monitor on a day-to-day basis; and

bb. IHG Brand Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

113. As further described above in in Section VI, the IHG Brand Defendants specifically retained and exercised control over the aspects of hotel operations at the InterContinental Chicago that caused or contributed to Jane Doe (K.R.D.)'s harm, including but not limited to: reservations of rooms, relevant policies (including payment method accepted, identification requirements, and hotel access for individuals who are not registered hotel guests) hotel security, employee training, guest and hotel staff reporting of security issues, and detection of and response to suspected sex trafficking. The IHG Brand Defendants had the right to exercise detailed, day-to-day control over and involvement in these areas. They also regularly and closely monitored these areas.

114. The IHG Brand Defendants had the right to and did enforce control over InterContinental Franchisee through various methods, including:

a. the right to conduct detailed inspections of the InterContinental Chicago;

b. monitoring or auditing the InterContinental Franchisee for compliance with policies and expectations;

42

c.  directing InterContinental Franchisee to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

d.  mandating training and education for franchisees and/or hotel staff;

e.  employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

f.  the right to impose fines or penalties;

g.  the right to impose additional conditions on franchisee or to restrict or limit its right to provide goods and services; and

h.  the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

## IX.  IHG Brand Defendants are jointly responsible for the trafficking of Jane Doe (K.R.D.).

115.  Upon information and belief, the rights and obligations regarding the operation, franchising, and control of the InterContinental Chicago were shared and fulfilled jointly by the IHG Brand Defendants. Upon information and belief, each of the IHG Brand Defendants shared revenue related to operation, franchising, and control of the InterContinental Chicago, and each of the IHG Brand Defendants experienced a direct benefit from the rental of rooms to traffickers at the InterContinental Chicago.

116.  Upon information and belief, each of the IHG Brand Defendants participated in a joint venture or integrated enterprise with one another regarding the operation, control, and franchising of the InterContinental Chicago. The IHG Brand Defendants, who were corporate affiliates subject to common ownership and control, were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management. They shared office space, employees, management, and policies. Thus, the IHG

43

Brand Defendants are vicariously liable for the actions of one another with regard to the operation, franchising, and control of the InterContinental Chicago.

117. Upon information and belief, operation of the InterContinental Chicago was part of a single unified operation by IHG Brand Defendants. Upon information and belief, all IHG Brand Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, IHG Brand Defendants acted jointly to own, operate, control, manage, and supervise the InterContinental Chicago. As an integrated enterprise and/or joint venture, IHG Brand Defendants were separately and jointly responsible for compliance with all applicable laws.

## CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

118. Jane Doe (K.R.D.) incorporates all other allegations.

**I.     Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (InterContinental Franchisee)**

119.  Jane Doe (K.R.D.) is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

120. InterContinental Franchisee is a perpetrator within the meaning of 18 U.S.C §1595(a) because it:

 a. knew about or was willfully blind to the activity leading to Jane Doe (K.R.D.)'s trafficking because they directly observed the obvious "red flags" of this trafficking activity;

 b. violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored individuals (including Jane Doe (K.R.D.)) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at their respective hotel properties.

c. violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, they knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that trafficked victims including Jane Doe (K.R.D.).

## II. Cause of Action: Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants).

121. Jane Doe (K.R.D.) is a victim of sex trafficking within the meaning of 18 U.S.C. §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C. §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA. Jane Doe (K.R.D.) is a victim of sex trafficking under 18 U.S.C. §§ 1591 and 1595(a) and is thus entitled to bring a civil action against any beneficiary who knowingly benefited from participation in a venture that the beneficiary knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

122. All Defendants are liable as beneficiaries under 18 U.S.C. § 1595(a).

123. **Venture 1:** Through acts and omissions more fully described throughout this Second Amended Complaint, the IHG Brand Defendants and InterContinental Franchisee received a financial benefit from participating in a venture with Jane Doe (K.R.D.)'s sex trafficker and other traffickers who regularly operated at the InterContinental Chicago.

a. Venture 1 resulted from the development of a continuous business relationship between these traffickers and the InterContinental Chicago, which formed when the IHG Brand Defendants and InterContinental Franchisee continued renting these traffickers hotel rooms despite the obvious "red flags" of their sex trafficking activity and created an environment at the InterContinental Chicago that facilitated their trafficking activities.

b. The IHG Brand Defendants and InterContinental Franchisee each directly participated in this ongoing business relationship through their respective roles in hotel operations—and specifically those aspects of operations that facilitated sex

45

trafficking—as described above. Through their participation, the IHG Brand Defendants and InterContinental Franchisee facilitated and supported the activities of sex traffickers of Jane Doe (K.R.D.) and other traffickers at the InterContinental Chicago.

c. The IHG Brand Defendants and InterContinental Franchisee benefited from this their participation in this venture because they received increased revenue and other benefits described above when rooms at the InterContinental Chicago were rented to traffickers, including Jane Doe (K.R.D.)'s trafficker.

d. This venture violated the TVPRA through the conduct of the traffickers who repeatedly harbored, maintained, provided, and exploited victims, including Jane Doe (K.R.D.), at the InterContinental Chicago.

e. The IHG Brand Defendants and InterContinental Franchisee knew or should have known that Venture 1 was engaged in violations of the TVPRA based on the "red flags" associated with the illegal activities of Jane Doe (K.R.D.)'s trafficker and other traffickers regularly operating at the InterContinental Chicago and because this trafficking would have been detected if they had exercised ordinary prudence.

124. **Venture 2**: Through the acts and omissions more fully described above, the IHG Brand Defendants and InterContinental Franchisee also participated together in a commercial hotel-operating venture that facilitated widespread sex trafficking at the InterContinental Chicago:

a. Venture 2 is a commercial venture that resulted from the business relationship between the IHG Brand Defendants and InterContinental Franchisee operating the InterContinental Chicago for the mutual purpose of maximizing revenue, including gross room revenue.

b. InterContinental Franchisee participated in this venture by using their on-the-ground role to operate the InterContinental Chicago in a way that they knew or should have known was facilitating sex trafficking.

c. The IHG Brand Defendants participated in this venture by (1) continuing the ongoing business relationship with InterContinental Franchisee despite actual or constructive knowledge the hotel was facilitating sex trafficking; (2) directly involving themselves in and supporting aspects of hotel operations that they knew or should have known were facilitating trafficking at the hotel in ways described above; and (3) continuing to lend the perceived legitimacy of their brand and provide marketing services for the hotel after they knew or should have known the venture was engaged in violations of the TVPRA.

46

d. The IHG Brand Defendants and InterContinental Franchisee all benefited from participating in Venture 2 as each derived revenue and other benefits from each room rented to a sex trafficker, including the rooms rented to the trafficker of Jane Doe (K.R.D.).

e. Venture 2 violated the TVPRA through the widespread sex trafficking that occurred at the InterContinental Chicago as victims—including Jane Doe (K.R.D.)—were harbored, maintained, provided, and exploited at the InterContinental Chicago. This venture also violated the TVPRA through the conduct of Franchisees, who violated 18 U.S.C. §1591(a) as perpetrators.

f. The IHG Brand Defendants and InterContinental Franchisee knew or should have known that this hotel-operating venture was facilitating sex trafficking, including the activities of the trafficker of Jane Doe (K.R.D.).

### III. Cause of Action: Vicarious Liability for TVPRA Violations (The IHG Brand Defendants).

125. The IHG Brand Defendants are vicariously liable for the TVPRA violations of the InterContinental Franchisee and hotel staff, who acted as the IHG Brand Defendants' actual agents.

126. An agency relationship existed between the IHG Brand Defendants and InterContinental Franchisee because, through the acts and omissions described more fully above, the IHG Brand Defendants exercised and retained the right to exercise pervasive control over InterContinental Franchisee and their operation of the InterContinental Chicago, including the means and methods they used and their day-to-day operations of the hotel.

127. An agency relationship also existed between the IHG Brand Defendants and InterContinental Franchisee because the IHG Brand Defendants retained and exercised control over the specific aspects of operations that caused Jane Doe (K.R.D.)'s harm as described above.

128. InterContinental Franchisee committed TVPRA violations—as both beneficiaries and perpetrators—within the scope of its agency relationship with the IHG Brand Defendants. Specifically, it committed these violations while renting rooms at the hotel and operating the hotel in a manner that facilitated sex trafficking.

47

129. Jane Doe (K.R.D.) further alleges that the IHG Brand Defendants are vicariously liable for the acts and omissions of the staff at the InterContinental Chicago as a joint employer. In the ways described throughout this Second Amended Complaint, the IHG Brand Defendants jointly controlled the terms and conditions of their employment. As a result, the IHG Brand Defendants and InterContinental Franchisee are the joint employers of the hotel staff.

130. Moreover, each of the IHG Brand Defendants is liable for the acts and omissions of the other IHG Brand Defendants with respect to the operation and franchising of the InterContinental Chicago. On information and belief, the IHG Brand Defendants, who were corporate affiliates subject to common ownership and control and who shared employees, operated as a joint venture engaged in profit sharing and subject to mutual control regarding the operation of the InterContinental Chicago. They operated as a single integrated enterprise and as alter-egos and/or agents of one another with respect to operation of the InterContinental Chicago, making them vicariously liable for one another.

## **TOLLING OF LIMITATIONS**

131. To the extent Defendants assert an affirmative defense of limitations, Jane Doe (K.R.D.) invokes the discovery rule. At the time she was harmed and through at least May 2016, Jane Doe (K.R.D.) was under the coercion and control of her trafficker who beat her, threatened her, psychologically abused her, exercised coercive control over her, and severely restricted her freedom. As a result, Jane Doe (K.R.D.) lacked the information and capacity to understand her injuries and their legal causes.

132. Thus, Jane Doe (K.R.D.) did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit. While she was under the control of her traffickers, Jane Doe (K.R.D.)—through no fault of her own—lacked the

information and understanding to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was a direct result of Jane Doe (K.R.D.) being kept under the control, coercion, and manipulation of her traffickers, which Defendants facilitated.

133. At the time Jane Doe (K.R.D.) was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being "trafficked" at Defendants' hotel or that she was a person "trafficked", much less that she was the "victim" of a legal venture involving defendants, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed.

134. To the extent Defendants assert an affirmative defense of limitations, Jane Doe (K.R.D.) invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Jane Doe (K.R.D.) faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before Jane Doe (K.R.D.) filed this lawsuit.

135. While under the control of her traffickers through at least May 2016, Jane Doe (K.R.D.) did not have the freedom to investigate her claims, to identify those responsible, or to seek legal representation necessary to pursue her legal rights. Jane Doe (K.R.D.) could not have pursued her claims while under the active control of her trafficker despite the exercise of ordinary diligence.

136. To the extent Defendants assert an affirmative defense of limitations, Jane Doe (K.R.D.) also invokes the continuing violation doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants, individually and in concert, across the subject locations.

137. Jane Doe (K.R.D.) was subject to continuous trafficking at the InterContinental Chicago through at least April 2016, which is not more than 10 years before Jane Doe (K.R.D.) filed this lawsuit.

138. This continuous trafficking resulted from Defendants' facilitation of trafficking at the InterContinental Chicago and Defendants' ongoing ventures with one another and with criminal traffickers at that hotel.

**DAMAGES**

139. Jane Doe (K.R.D.) sustained legal damages as a result of being the victim of sex trafficking under the TVPRA.

140. Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (K.R.D.).

141. Jane Doe (K.R.D.) is entitled to be compensated for personal injuries and economic damages, including:

a. Actual damages (until trial and in the future)

b. Incidental and consequential damages (until trial and in the future);

c. Mental anguish and emotional distress damages (until trial and in the future);

d. Lost earnings and lost earning capacity (until trial and in the future);

e. Necessary medical expenses (until trial and in the future);

f. Life care expenses (until trial and in the future);

g. Physical pain and suffering (until trial and in the future);

h. Physical impairment (until trial and in the future);

i. Emotional impairment (until trial and in the future);

j. Exemplary/Punitive damages;

k. Attorneys' fees; and

l. Costs of this action.

m. Pre-judgment and all other interest recoverable.

## JURY TRIAL

142. Jane Doe (K.R.D.) demands a jury trial on all issues.

## RELIEF SOUGHT

143. WHEREFORE, Jane Doe (K.R.D.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (K.R.D.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (K.R.D.) may, in law or in equity, show herself to be justly entitled.

**Respectfully submitted,**
**Sico, Hoelscher & Harris**

**By: /s/ David Echols Harris**
**David Echols Harris | 24049273**
**819 N. Upper Broadway**
**Corpus Christi, Texas 78401**
**877.653.3334 (phone)**
**dharris@shhlaw.com**

**Bryan O. Blevins, Jr. | SBN 02487300**
**(Pro Hac Vice Forthcoming)**
**Colin D. Moore | SBN 24041513**
**(Pro Hac Vice Forthcoming)**
**350 Pine Street, Ste. 1100**
**Beaumont, TX 77701**
**Phone: (409) 835-6000**
**bblevins@pulf.com**
**cmoore@pulf.com**

51